UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Robert L. Verdi, Jr.,

       Plaintiff,

v.                               Civil Action No. 2:10-CV-135

Commissioner of Social Security,

       Defendant.

## OPINION AND ORDER
(Docs. 7, 12)

Plaintiff Robert L. Verdi, Jr. brings this action under 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits.  Pending before the Court are Verdi's motion seeking an order reversing the Commissioner's decision (Doc. 7), and the Commissioner's motion seeking an order affirming the decision (Doc. 12).

For the reasons set forth below, Verdi's motion to reverse (Doc. 7) is denied, and the Commissioner's motion to affirm (Doc. 12) is granted.  Pursuant to Local Rule 7(a)(6), and no party having made a written request for oral argument, the Court concludes that oral argument is not required.

## Background

Verdi was born on October 25, 1959, and thus was forty-five years old on the alleged disability onset date of May 20, 2005.  (Administrative Record ("AR") 24, 38, 77,

96.)  He completed high school, and has work experience as a chef.  (AR 24-25, 38, 92-95, 106, 374.)  On May 20, 2005, after having a history of low back pain and two prior back surgeries, Verdi injured his back while performing his job duties as a chef at Cannon's Restaurant in Burlington, Vermont.  (AR 25, 92, 331.)  While preparing for a third back surgery, it was discovered that Verdi had coronary artery disease which required Verdi to postpone the back surgery and undergo heart surgery.  (AR 246, 341, 362.)  In April 2006, Verdi had heart bypass surgery (AR 187, 240, 246, 273), and then in March 2007, he had spinal surgery (AR 432-33), followed by extensive physical and occupational therapy.  Soon thereafter, in August 2007, Verdi had surgery to repair an umbilical hernia.  (AR 414-15.)  In October 2007, Verdi discontinued physical and occupational therapy, and subsequently moved to Tennessee.  (AR 509-12.)

In February 2006, Verdi applied for disability insurance benefits, alleging that he became unable to work on May 20, 2005 due to lower back problems, a heart abnormality, and hypertension.  (AR 77, 100-01.)  He explained that these conditions limited his ability to work because they caused constant pain in his lower back radiating down into both legs, as well as numbness in the back of both legs down to his feet.  (AR 101.)  Verdi stopped working due to these conditions on January 28, 2006.  (*Id.*)  Prior to that date and after he suffered the May 2005 back injury, he was working on a part-time basis.  (AR 92-93.)  Verdi explains that his conditions cause him extreme pain, anxiety, and depression (AR 109); and that he is unable to do many physical activities without "moderate to extreme pain" due to "extremely poor" lower mobility (AR 113).  He further explains that since his injury in May of 2005, his lifestyle has changed drastically,

2

and he is unable to do approximately eighty-five percent of what he used to do as a result of mobility and weight restrictions.  (AR 115.)

Verdi's disability insurance benefits application was denied initially and upon reconsideration, and he timely requested an administrative hearing, which occurred on March 4, 2008.[1]  (AR 18-36, 38-40, 52.)  He appeared and testified at the hearing, and was represented by counsel.  (AR 18-36.)  On April 17, 2008, Administrative Law Judge ("ALJ") Robert Klingebiel issued a decision finding that Verdi was not disabled under the Social Security Act, as described in detail below.  (AR 10-16.)  On April 16, 2010, the Appeals Council denied Verdi's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1-3.)  Having exhausted his administrative remedies, Verdi filed his Complaint in the instant action on June 4, 2010.  (Doc. 1.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R.

---

[1]  Verdi states in his motion that, sometime after the denial of his initial application, he was awarded benefits on a "separate application" "as of his 50th birthday."  (Doc. 7 at 1.)

Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).

The claimant is presumptively disabled if the impairment meets or equals a listed

impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to

consider whether the claimant's "residual functional capacity" ("RFC") precludes the

performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The

fifth and final step requires the ALJ to determine whether the claimant can do "any other

work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving

his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a

"limited burden shift to the Commissioner" to "show that there is work in the national

economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009)

(clarifying that the burden shift to the Commissioner at step five is limited, and the

Commissioner "need not provide additional evidence of the claimant's residual functional

capacity").

Employing this five-step analysis, ALJ Klingebiel first determined that Verdi had

not engaged in substantial gainful activity since his alleged onset date of May 20, 2005.

(AR 12.)  At step two, the ALJ found that, although Verdi's depression was not severe,

he had the severe impairments of "status post lumbar surgery" and "coronary artery

disease status post 2-vessel by-pass [sic] surgery."  (*Id.*)  At step three, the ALJ found

that Verdi did not have an impairment or combination of impairments that met or

medically equaled a listed impairment.  (AR 13-14.)

Next, the ALJ determined that Verdi had the RFC to perform the full range of

sedentary work, as defined in 20 C.F.R. § 404.1567(a).  (AR 14.)  The ALJ explained

that, although Verdi's medically determinable impairments could reasonably be expected

to cause the alleged symptoms; his statements concerning the intensity, persistence, and

limiting effects of those symptoms "[we]re not credible to the extent they [we]re

inconsistent with the [RFC] assessment."  (AR 14-15.)  In making this RFC assessment,

the ALJ noted that Verdi had remained quite active, was able to not only care for his own

personal needs but also care for an elderly gentleman, and did not take strong pain

medications.  (AR 15.)  The ALJ further noted that no treating or examining physician

had described Verdi as disabled or unable to work, and two occupational therapists had

indicated that Verdi could perform work at a sedentary-to-light exertional level.  (*Id.*)

Given these findings and RFC assessment, the ALJ determined that, although

Verdi was unable to perform his past relevant work, the Medical-Vocational Guidelines

(Guideline 201.21) directed a finding of "not disabled," considering Verdi's age on the

alleged disability onset date, education, work experience, and RFC.  (AR 15-16.)  The

ALJ concluded that Verdi had not been under a disability, as defined in the Social

Security Act, from May 20, 2005 through the date of the ALJ's decision on April 17,

2008.  (AR 16.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded the Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*,

66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

## Analysis

Verdi makes two arguments in his moving brief: (1) the ALJ failed to consider the combined effects of Verdi's impairments on his ability to work; and (2) the ALJ's assessment of Verdi's credibility is not supported by substantial evidence.[2]  In response, pointing to Verdi's failure to cite to specific evidence of record or explain how such evidence supports his arguments, the Commissioner contends that the ALJ's decision is supported by substantial evidence and complies with the applicable legal standards.  For the reasons explained below, the Court finds in favor of the Commissioner.

## I.     Combined Effects of Verdi's Impairments on His Ability to Work

Verdi argues that, in determining he was not disabled, the ALJ failed to consider the combined effect of his impairments, including his surgeries, on his ability to work. Specifically, Verdi contends that the recovery period for each of his respective surgeries which occurred during the alleged disability period (open heart surgery, back surgery, and hernia repair surgery), combined with the time required to prepare for each surgery,

---

[2]  Although apparently not sought at the administrative level, Verdi now seeks a closed period of disability ending in October 2007 (Doc. 7 at 2), thus seeking disability benefits for the limited period of May 20, 2005 through October 31, 2007, as opposed to for an open-ended period from May 20, 2005 through the date of the ALJ decision, April 17, 2008, and beyond.  Neither party has raised or discussed the issue of the propriety or effect of a claimant changing his or her alleged disability period at the level of a court's review of the ALJ decision.  However, in accordance with Second Circuit law instructing courts to broadly construe and liberally apply the Social Security Act, *see, e.g., Dousewicz*, 646 F.2d at 773, the Court assumes such a change is proper, and even if it were not, finds that the error is harmless in this case, as the record does not demonstrate that Verdi's condition changed in any way that would affect his right to disability benefits from the date of the alleged end of the closed disability period, October 31, 2007, until the date of the ALJ decision, April 17, 2008.

left him unable to work for a two-year period.  (Doc. 7 at 4-5.)  Preliminarily, the

Commissioner is correct that Verdi has failed to cite to specific portions in the record in

support of his argument that, "[w]hile the recovery period for any one of [Verdi's]

surgeries would probably have been less than a year, the combination of time required in

preparation for th[e] series of surgeries left Mr. Verdi unable to work for a two year

period."  (Doc. 7 at 5.)  To the extent Verdi argues that, *in general*, an individual is

disabled while he or she is preparing for or recovering from surgery, the argument fails,

as the mere fact that an individual is preparing for or recovering from a particular surgery

says nothing – in and of itself – about that individual's ability to work.  Verdi's specific

argument that, *in this particular instance*, the ALJ failed to consider his ability to work

while recovering from and preparing for the combination of back, heart, and hernia

surgeries, also fails, for the following reasons.

     The regulations require that, at step two of the five-step sequential process, ALJs

must consider "the combined effect of all of [the claimant's] impairments without regard

to whether any such impairment, if considered separately, would be of sufficient

severity" to be the basis for disability benefits eligibility.  20 C.F.R. § 404.1523; *see also*

404.1520(c).  Moreover, in assessing a claimant's RFC, ALJs must "consider all of [the

claimant's] medically determinable impairments of which [they] are aware, including

[the claimant's] medically determinable impairments that are not 'severe' . . . ."  20

C.F.R. § 404.1545(a)(2); *see also* 20 C.F.R. § 404.1545(e).  In accord with these

requirements, the Second Circuit has long recognized that "the combined effect of a

claimant's impairments must be considered in determining disability; the [Social Security

Administration] must evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir. 1995) (citations omitted); *Burgin v. Astrue*, 348 Fed. Appx. 646, 647 (2d Cir. 2009).

Verdi fails to cite to any specific limitations on his ability to work that were allegedly caused by the combination of his surgeries or impairments which the ALJ did not address or addressed in an inappropriate manner in his decision. Moreover, the ALJ's decision itself reveals that the ALJ did in fact consider the combined effect of Verdi's surgeries and impairments in determining the severity of Verdi's impairments and assessing Verdi's RFC. At least one court has held that, where (as here) the list of impairments is complete in the ALJ's decision – in that it identifies all of the claimant's impairments – the decision is "not vulnerable to . . . reversal" on grounds that the ALJ failed to consider all of the claimed impairments in combination. *See Tinsley v. Barnhart*, No. 3:01CV977 (DJS) (TPS), 2005 WL 1413233, at *6 (D. Conn. June 16, 2005).

In this case, in the context of considering the severity of Verdi's impairments, the ALJ's decision includes a discussion of Verdi's depression, back issues and surgeries, coronary artery disease and heart bypass surgery, and abdominal hernia and subsequent surgery, as well as findings that the back and heart conditions were "severe" but the depression was not. (AR 12-13.) Specifically with respect to Verdi's most recent back surgery, the ALJ recorded a fairly comprehensive review of the records documenting its effect on Verdi's functional abilities. The ALJ stated:

[Verdi] was evaluated by Dr. Warren Rinehart in November 2005 after complaining of 5 months of low back pain following a work-related accident. . . . MRI testing was considered to show disc protrusion at L4-5. [Verdi] was also noted to have had lumbar surgery in 1989 and repeat surgery in 2000. MRI testing did show scarring at L5-S1 [(AR 297)]. [Verdi] elected to undergo[] fusion surgery, but while he was under evaluation for this procedure, he was noted to have abnormal testing consistent with coronary artery disease. Therefore, on April 27, 2006 he underwent 2-vessle by-pass [sic] graft surgery under the care of Dr. F. Ittleman [(AR 187-88)]. . . . In October 2006 he returned to Dr. Michael Borrello for further consideration of his low back symptoms. He was found to have normal motor function, but positive straight leg raising. He underwent fusion surgery in March 2007 [(AR 313-20)]. . . .

[Verdi] was attending rehabilitation for his back in July 2007 when Occupational Therapist G. Coleman noted that he was able to carry 60 pounds got [sic] 50 feet and that he had normal gait. He could occasionally lift 40 pounds from floor to waist. He could perform repetitive lifting of 10 pounds floor to waist. He reported the ability to sit for 3-4 hours, walk for 30 minutes and walk/stand for 45-60 minutes [(AR 471-72)]. He . . . developed an abdominal hernia for which surgical repair was performed in July 2007. Treatment was complete in August 2007 according to records from Dr. Edward Borrazzo [(AR 412-17)].

In September 2007 [Verdi] was again attending physical therapy at which time he was noted to be able to sit without problem, stand for 30 minutes, walk for 20-30 minutes, lift 30 pounds floor to waist and 30 pounds waist to shoulder. He was assessed as demonstrating a work capacity for light work [(AR 506-07)]. In February 2008 he underwent an independent medical examination performed by Dr. Edward Kahn. [Verdi] had no muscle spasm and intact sensation. Dr. Kahn noted that [Verdi] was doing light cooking for an elderly man. He assessed [Verdi] as able to perform light sedentary to light work alternating sitting and standing with no bending, stooping or twisting and with a maximum lift of 15 pounds from a tabletop and no weight from the floor [(AR 519-24)].

(AR 12-13.)

In assessing Verdi's RFC, the ALJ again discussed Verdi's depression and back

problems, ultimately finding that they were not so severe as to prevent Verdi from being

able to work. (AR 15.) Specifically, the ALJ noted that Verdi "has had some ongoing

low back pain, but in July 2007 his functional capacity as described by Occupational Therapist Coleman was consistent with at least sedentary and even light to medium work." (AR 15.) This assessment is supported by other evidence in the record. For example, six days after Verdi's March 2007 back surgery, Dr. Scott Benjamin, a rehabilitation specialist, stated in Verdi's discharge summary report that Verdi "was able to relatively quickly regain mobility and self-care independence with comprehensive therapy services." (AR 475.) A few months later, on May 7, 2007, a follow-up note from the Spine Institute of New England recorded that "[Verdi] is making appropriate progress[,]" and recommended "a regimented and regular conditioning program of non impact aerobic conditioning[,]" including "an exercise walk twenty to thirty minutes a day." (AR 423.) The "Plan" section of the note stated: "Activities as tolerated." (*Id.*) Approximately one month later, on June 14, 2007, Dr. Robert Monsey, Verdi's orthopedic surgeon, noted that, although Verdi had "minimal functional gains" from the surgery and was still having back discomfort, he was "[o]verall making progress" and feeling "maybe a little bit better than before surgery." (AR 420.) Three months later, in September 2007, treatment notes from the Spine Institute of New England documented that "[Verdi] . . . is getting increasing functional gains. He feels he is about 40-60% better than prior to h[is] surgery." (AR 469.)

The ALJ did not specifically discuss Verdi's heart or abdominal hernia surgeries in assessing Verdi's RFC, but there was no need for such discussion. With respect to the hernia surgery, in August 2007, approximately three weeks after the surgery, surgeon Dr. Edward Borrazzo reported that Verdi was "overall doing well and fully recovered," and

ordered that Verdi "avoid any heavy lifting for another few weeks and then resume activity . . . without restriction." (AR 412.) With respect to the heart surgery, Verdi did not complain about or seek treatment for a cardiac problem until imaging tests completed in preparation for back surgery in the spring of 2006 unexpectedly revealed "a total occlusion" in the left anterior descending artery, requiring coronary artery bypass grafting. (AR 281.) Even then, Verdi told his cardiologist, Dr. Kevin Carey, only that he "ha[d] a vague sense of some occasional chest pressure with exertion." (*Id.*) In accord, Verdi's heart surgeon, Dr. Frank Ittleman, noted that Verdi was "not particularly symptomatic" prior to surgery. (AR 266.) The heart surgery occurred on April 27, 2006 (AR 187-88), and within two months of that date, Verdi reported to Dr. Ittleman that he was "walking short distances most days and not experiencing any adverse symptomatology" (AR 266). Verdi denied "angina type pain or shortness of breath," and Dr. Ittleman stated that he was "pleased with Mr. Verdi's progress[,]" and that, as of June 13, 2006, Verdi "ha[d] done quite well[.]" (*Id.*) The record as a whole does not indicate that Verdi was limited in his ability to work as a result of his heart surgery, and certainly not "for a continuous period of at least [twelve] months." 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").

A review of the ALJ decision, coupled with an overall review of the record, demonstrates that the ALJ considered all of Verdi's relevant surgeries and impairments, as well as the functional limitations caused by the combination thereof, in determining the severity of Verdi's impairments and assessing Verdi's RFC. Moreover, substantial

evidence exists in the record to support the ALJ's severity and RFC determinations, as discussed in more detail below.  Therefore, Verdi has failed to demonstrate grounds for reversing or remanding based on the ALJ's alleged failure to consider the combined effects of Verdi's surgeries and impairments on his ability to engage in sedentary work.

## II.   ALJ's Credibility Determination

Verdi next makes a cursory argument that the ALJ's credibility determination is not supported by substantial evidence.  (Doc. 7 at 5-6.)  In response, citing to case law largely from the First Circuit, the Commissioner preliminarily argues that this argument should be deemed waived, given Verdi's failure to properly develop it.  (Doc. 12 at 9-10 ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").)  The point is well-taken.  *See, e.g., Collins v. Marina-Martinez*, 894 F.2d 474, 481 n.9 (1st Cir. 1990) ("It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Metz v. Astrue*, No. 1:06-CV-1509 (FJS/DRH), 2010 WL 2243343, at *10 (N.D.N.Y. Apr. 21, 2010) (citing *Graham v. United States*, 753 F. Supp. 994, 1000 (D. Me. 1990)).  Notwithstanding the Commissioner's waiver argument, however, Verdi's credibility claim fails, given that the ALJ applied the correct legal standard and there is substantial evidence supporting the ALJ's credibility determination, as explained in detail below.

It is the province of the Commissioner, not the reviewing court, to "appraise the credibility of witnesses, including the claimant."  *Aponte v. Sec'y of Health & Human*

*Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).  If the Commissioner's findings are supported

by substantial evidence, the court must uphold the ALJ's decision to discount a

claimant's subjective complaints.  *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and*

*Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)).  "When evaluating the credibility of an

individual's statements, the adjudicator must consider the entire case record and give

specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996

WL 374186, at *4 (Jul. 2, 1996).  An important indicator of the credibility of a claimant's

statements is their consistency with other information in the record, including the

claimant's medical treatment history.  *Id.* at *5, 7.

  Here, the ALJ concluded that Verdi's statements regarding the intensity,

persistence, and limiting effects of his symptoms "are not credible to the extent they are

inconsistent with the [ALJ's RFC] assessment."  (AR 15.)  In support of this credibility

determination, the ALJ noted that, with respect to Verdi's depression, he had sought

treatment for only a brief period of approximately two months.  (*Id.*)  The ALJ further

noted that Verdi had never been described as having any difficulty with attention and

concentration, and consultative psychologist Dr. Ellen Atkins had recorded normal

mental status and assigned Verdi with a Global Assessment of Functioning ("GAF")

score of 69.[3]  (AR 13, 375-76.)  The record supports these findings.  Specifically, a note

from psychotherapist Dr. Ezra Maurer indicates that Verdi "entered treatment on August

---

  [3] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'"  *Kohler v. Astrue*, 546 F.3d 260, 262, fn. 1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*, at 32 (4th ed. 2000)).

7, 2006 complaining of symptoms concomitant with a diagnosis of Major Depressive

Disorder with chronic course and moderate severity[, and] . . . was seen once to twice per

week for 15 sessions until October 17, 2006[,]" approximately two months after

beginning treatment.  (AR 313.)  Moreover, the record reveals that, after a detailed

examination and review of Verdi's medical and psychological history, Dr. Atkins

assigned a GAF score of 69 to Verdi (AR 376), which score is assigned to individuals

who demonstrate only "'[s]ome mild symptoms (e.g., depressed mood and mild

insomnia) OR some difficulty in social, occupational, or school functioning . . ., but [who

are] *generally functioning pretty well*, [and having] some meaningful interpersonal

relationships.'"  *Zabala v. Astrue*, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (quoting Am.

Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV")*,

at 34 (4th ed. 2000)) (emphasis added).  Furthermore, Dr. Atkins reported that Verdi

socialized with friends one-to-two times each week and performed "well within the

normal range" in cognitive functioning testing.  (AR 375-76.)  Dr. Atkins concluded that,

although Verdi "was perhaps minimizing his distress, *his anxiety and mood disorders . . .*

*do not seem so severe as to interfere with his ability to work*."  (AR 377 (emphasis

added).)

　　　Verdi's own testimony also supports the ALJ's credibility determination with

respect to the disabling affect of Verdi's depression.  Specifically, at the March 2008

administrative hearing, Verdi initially stated that, although he was not taking any

medication for depression, he was being "treated" for depression.  (AR 30.)  Soon

thereafter, conflictingly, he stated that he was not "seeing anyone" for his depression.

(AR 31.)  A review of the record supports the latter statement, i.e., that Verdi was not seeing anyone (or being treated) for depression at the time of the administrative hearing. Moreover, at the hearing, Verdi testified that he fights his depression every day, and it affects his ability to concentrate by making it "[d]ifficult sometimes" although "[s]ometimes it's all right."  (AR 31.)  It is reasonable to assume that an individual who experiences depression that is sometimes "difficult" and sometimes "all right" would still be able to work.  Likewise, Verdi reported to Dr. Atkins in April 2007 that his mood was "'a little bummed out' with occasional episodes of deep sadness."  (AR 376.)  This statement also supports the ALJ's credibility determination, as it reflects that, although Verdi suffered from depression, it was not so severe as to prevent him from working.

With respect to Verdi's low back pain, the ALJ stated that the following facts support his credibility determination.  First, the ALJ noted that Occupational Therapist Gregory Mark Coleman described Verdi's functional capacity as "consistent with at least sedentary and even light to medium work."  (AR 15.)  This description of the record is accurate, as Coleman's July 3, 2007 report states that Verdi "is *currently testing at a light-medium level* for strength; however, his poor showing with repetitive activity and his poor tolerance for remaining on his feet and active, suggest hi*s true overall capacity is closer to a sedentary or light level*."  (AR 472 (emphasis added).)

Second, the ALJ noted that Verdi "has remained quite active," "is able to care for his personal needs," worked part-time after the alleged onset date, "cares for an elderly gentleman," and "performs meal preparation as well as shopping."  (AR 15.)  The record does not entirely support the statement that Verdi "has remained quite active."  For

example, at the March 2008 administrative hearing, Verdi testified that he is able to walk only a "[c]ouple of blocks" and then he has to rest.  (AR 30.)  And in a March 2006 Function Report, Verdi stated that he "need[s] help carrying [l]aundry [b]askets," and cannot do any "outside work," including shoveling, mowing, and raking, because doing these tasks causes him moderate to extreme pain, and he has limited mobility and ability to bear weight.  (AR 110-11.)  But at most, the ALJ's statement that Verdi was able to "remain[] quite active" is harmless error, given that the ALJ determined that Verdi could perform only "sedentary" work, which does not require an individual to be "active."[4] Moreover, the record reflects that, by his own admission, although his conditions cause him pain, anxiety, and depression, Verdi is able to engage in many daily activities, including shopping for food, clothing, and household needs two-to-three times a week for four-to-five hours at a time; preparing meals, including complete meals with several courses; cleaning his house ("with many [b]reaktimes"); and doing "home care" for an elderly gentleman friend.  (AR 24, 32-33, 35-36, 109-11.)  Moreover, Verdi describes his typical day as involving "hang[ing] out with friends," "go[ing] to lunch," and maybe going shopping, among other things.  (AR 108.)

Next, the ALJ supported his credibility determination by stating that Verdi "does not take strong medications for pain . . . ."  (*Id.*)  The record does in fact reflect that, for the most part, Verdi does not take strong pain medications.  Specifically, although in

---

[4]  The regulations define "[s]edentary work" as follows: "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

March 2006 Function and Pain Reports, Verdi stated that he was in pain "[a]ll the time" (AR 117), and that the level of this pain was sometimes "[e]xtreme" (AR 109), the only medication listed in the Pain Report is Advil (ibuprofen) (AR 118). Similarly, in October 2006, Dr. Borrello stated in a treatment note that Verdi was taking only Advil and Tylenol "for acute painful episodes," and that they were "help[ing]." (AR 331.) The Doctor also noted that "[r]esting and Tylenol or Motrin slightly decreases [Verdi's] pain." (Id.)[5] Moreover, in a Social Security Administration form titled "Claimant's Medications" and dated February 11, 2008, Verdi reported that he was taking only Vytorin, fosinopril, and aspirin, all of which were prescribed by Verdi's primary care physician, Dr. James Dougherty, to treat Verdi's heart condition (not pain). (AR 162.)

Noteworthy, however, the record reveals that there were times when Verdi took medications stronger than Advil and Tylenol for pain, in conflict with the ALJ's statement to the contrary. Specifically, immediately after Verdi's March 2007 back surgery, he was prescribed OxyContin, "with gradual tapering schedule over the next three weeks." (AR 475.) Moreover, on April 16, 2007, Dr. Atkins noted that Verdi had reported to her that he "takes one [D]ilaudid to help him sleep, and on occasions when the pain reaches an 8 or above he will take 2 [D]ilaudid to reduce the pain." (AR 375.) In accord, on May 7, 2007, notes from the Spine Institute of New England indicate that

---

[5] In the same report, anesthesiologist Dr. Michael Borrello stated that "[o]ther medications which could be considered . . . include Neurontin or even Cymbalta." (AR 332.) The Doctor also listed "Vytorin, Metoprolol, fosinopril and asprin" as Verdi's "CURRENT MEDICATIONS." (AR 331.) Other than aspirin, none of these other medications is generally prescribed for pain, and Verdi does not argue that they were prescribed for pain in this case. Moreover, on April 16, 2007, Dr. Atkins noted that Verdi's cardiologist had prescribed "vitorin and fosenopril . . . for hypertention[, but] Mr. Verdi says he has not taken these medications since his back surgery a month ago because he was tired of medication and needed a break." (AR 375.)

Verdi "is taking one Dilaudid at night and one Robaxin to help with his discomfort."
(AR 423.)  OxyContin and Dilaudid are narcotic pain relievers similar to morphine,
generally prescribed for the relief of moderate to severe pain, *see OxyContin*,
DRUGS.COM (April 12, 2009, 4:37:04 PM), http://www.drugs.com/oxycontin.html;
*Dilaudid*, DRUGS.COM (July 9, 2010, 4:10:13 PM), http://www.drugs.com/dilaudid.html;
and Robaxin is a muscle relaxant, generally used together with rest and physical therapy
to treat skeletal muscle conditions such as pain or injury, *see Robaxin*, DRUGS.COM (April
12, 2009, 4:38:47 PM), http://www.drugs.com/robaxin.html.  Yet the Court is aware of
no other reference to Robaxin in the record; and with respect to the OxyContin and
Dilaudid, it appears Verdi stopped taking them sometime before September 2007, as on
September 11, 2007, treatment notes from the Spine Institute of New England reported
that "[Verdi] is taking no pain medications."  (AR 469.)  Thus, the record demonstrates
that Verdi was taking pain medications stronger than Advil or Tylenol for only a short
period of approximately six months or less, and consequently, the ALJ's statement that
Verdi was not taking strong medications for pain was harmless error, at most.

Finally, in support of his credibility determination, the ALJ noted that no treating
or examining physician had described Verdi as disabled or unable to work, and two
occupational therapists had indicated that Verdi could perform work at a sedentary-to-
light exertional level.  The record generally supports these assessments.  Specifically,
although the record contains notes from medical providers recommending limited periods
of work restriction or only part-time work (see AR 294, 503-04, 511), no treating source
opined that Verdi was unable to work at even a sedentary level for more than a limited

19

period.  Specifically, on May 27, 2005, approximately two years before Verdi's most

recent back surgery, Physical Therapist Stacey Ladd stated that, due to lower back pain,

Verdi "[s]hould not work" for a brief period of approximately one week from May 26

through 31, 2005; and then on June 1, 2005, Ladd stated that Verdi "[m]ay return to

work" for three-to-four hours each day with no heavy lifting for approximately six days,

at which time she would reevaluate him.  (AR 503-04.)  Likewise, a few months later, in

August 2005, Dr. Dougherty noted that Verdi was restricted to working only "4-5 hours"

each day with no "mopping."  (AR 294.)  Nothing in the record indicates that these

providers would have further opined either that (a) Verdi could not work on a full-time

basis, even at the sedentary level; or (b) the stated restrictions would need to remain in

place even after Verdi's March 2007 back surgery.

    In September 2007, Occupational Therapist Linda Sheridan opined that Verdi's

"[d]emonstrated work capacity" was "[l]ight," and explained: "Due to decreased

endurance, it is difficult for Mr. Verdi to sustain a work effort for 60 minutes at a light

level, though he tests at that level."  (AR 506.)  Approximately one month later, in

October 2007, Sheridan reported that Verdi felt like he had "benefitted from his

occupational therapy program," and opined that "[Verdi] now tests a[t] a medium work

capacity but it is felt that he would be unable to sustain a medium work capacity for a full

day of work.  It is recommended that he return to work at a light to light-medium work

capacity starting part-time."  (AR 511.)  Neither of Sheridan's reports say anything about

whether Verdi was able to sustain a work effort at a *sedentary* level, which the ALJ

determined Verdi was able to do, in proper explicit reliance on (a) occupational therapist

Coleman's report stating that Verdi's "true overall capacity" for work is at the "sedentary or light level" (AR 472), and (b) orthopedic surgeon Dr. Edward Kahn's February 21, 2008 opinion that, "[i]n regards to permanent work restrictions, I would categorize [Verdi] in the light category for light sedentary" (AR 523).

The ALJ appears to have considered the entire case record in assessing Verdi's credibility.  Moreover, the ALJ recorded specific reasons for the weight given to Verdi's statements, and there is substantial evidence in the record to support these reasons. Therefore, there are no grounds to reverse the ALJ's decision or remand for further proceedings based on the ALJ's credibility determination.

## Conclusion

For the above reasons, Verdi's Motion to Reverse (Doc. 7) is DENIED, and the Commissioner's Motion to Affirm (Doc. 12) is GRANTED.  Accordingly, the decision of the Commissioner is hereby AFFIRMED.

Dated at Burlington, in the District of Vermont, this 11th day of April, 2011.


/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge